## DECLARATION of DAMIAN R. PLATOSH

I, Damian R. Platosh, do hereby declare:

### BACKGROUND/EXPERIENCE

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been for approximately 27 years. I am currently assigned to the Portland Division of the FBI. During my tenure with the FBI, I have received training in the investigation of complex financial crimes and in financial analysis and am a licensed Certified Public Accountant. As part of my duties as a Special Agent, I have investigated criminal violations relating to complex corporate fraud. During my career, I have been the affiant on applications for search warrants and arrest warrants in federal criminal investigations.

### PURPOSE OF THIS DECLARATION

2.  This declaration is submitted in support of the complaint seeking *in rem* forfeiture of $1,724,802.75 in United States currency voluntarily turned over to the United States pursuant to the terms of a Non-Prosecution Agreement ("Agreement") marked as Exhibit B, which is attached and fully incorporated herein by this reference.

3.  As set forth below, there is probable cause to believe, and I do believe, that the Defendant $1,724,802.75 in United States currency represents substitute assets in lieu of proceeds that are directly traceable to violations of 18 U.S.C. § 1960, and that the Defendant currency is therefore forfeitable to the United States pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C).

4.  This declaration is intended to show only that there is sufficient probable cause for the requested complaint and does not set forth all my knowledge about this matter. The facts set forth in this declaration are based on my own personal knowledge, knowledge obtained from other

individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## SUMMARY OF THE INVESTIGATION

5. The Federal Bureau of Investigation ("FBI") opened an investigation in December 2019 of a criminal organization based in Nigeria that operated several online fraud schemes, including romance scams, targeting elderly women in the United States.

6. Over the course of the investigation, the FBI identified a Nigeria-based black market currency exchange network that offered U.S. dollar deposits into U.S.-based bank accounts in exchange for Nigerian currency, including the U.S.-based bank accounts owned by Oregon Tool, Inc., (the "Company") which at all relevant times was known as Blount, Inc. ("Blount"). The currency exchange affected interstate and foreign commerce and was not licensed to operate a money transmitting business by the State of Oregon or registered pursuant to 31 U.S.C. § 5330. Blount's two Nigerian distributors (hereafter "Distributor 1" and "Distributor 2") used this unlicensed money transmitting business during periods from 2012 to 2020 to convert Naira to U.S. dollars which were used to pay Blount.

7. In March 2012, the U.S. Secret Service notified Blount's then-General Counsel (the "General Counsel") that the agency was preparing to seize Distributor 1's bank account. In February 2014, in response to a request from the General Counsel, the U.S. Secret Service sent the complaint that had been filed and notified the General Counsel that Distributor 1's bank account was seized because it was alleged to be funded primarily by fraud and that the proceeds of such fraud were used to pay Blount.

8. From November 2016 to December 2017, Blount received deposits totaling $974,954 to its bank account from several sources other than Distributor 1 that were used to pay Distributor 1's invoices. These sources included individuals (many of whom the FBI assesses were women over age 60), business LLCs, and anonymous cash depositors. The deposits originated from either anonymous sources or sources with no logical business relationship or established history with Distributor 1 or Blount. The deposits originated from several U.S. states unrelated to Distributor 1's operations. Some of the deposits included memos inconsistent with a payment for Blount's goods, including "loan repayment" and a reference to a person's name who is not affiliated with Blount or any distributor, and were in varied round dollar amounts from $200 to $200,000. During this period, employees of Blount to include senior executives were made aware of additional allegations of fraud, as detailed below.

9. In November 2016, a Blount Regional Manager wrote in an email to eight Blount employees that Distributor 1 was obtaining U.S. dollars on the "black market" so Distributor 1 can pay as fast as possible.

10. In August 2017, the Dekalb County (Illinois) Sheriff's Office notified Blount's then-Chief Financial Officer (the "Chief Financial Officer") of deposits into Blount's bank account totaling $72,900 from a fraud victim that occurred in early 2017.

11. In August 2017, a Senior Credit Analyst at Blount learned that two deposits totaling $40,700 were made by a person who believed the person was purchasing artwork for someone the person had met on a dating website.

12. Following the notification from the Dekalb County (Illinois) Sheriff's Office, Blount began reviewing the deposits received on behalf of Distributor 1 and implemented a policy of not crediting Distributor 1 with payments received beginning on August 16, 2017. In September 2017,

Blount executives including the General Counsel and Chief Financial Officer reviewed deposits on behalf of Distributor 1, identified several unusual depositors, and questioned Distributor 1 about the origin of the deposits. Distributor 1 responded that, in order to obtain U.S. dollars, it had to "source foreign exchange from the black market, and other possible sources outside Nigeria."

13. In late 2017, a Credit Manager at Blount compiled a spreadsheet of "Suspect Payments" benefiting Distributor 1 totaling $862,085. The spreadsheet included a $131,000 deposit from a person in Beaverton, Oregon in June 2017. The FBI learned this person made the deposit at the request of someone she met on a dating website. The FBI learned several other people on the list reported being the victim of similar fraud schemes.

14. Based on its review of the prior deposits made on behalf of Distributor 1, in September 2017, Blount required Distributor 1 to (1) only provide payment from accounts regarding which Distributor 1 or its owner was verified as a signatory by the relevant bank; and (2) recertify compliance with Blount's Code of Conduct. In addition, Blount informed Distributor 1 that it would return wired transfer funds received since August 16, 2017.

15. In February 2018, a U.S. bank notified Blount that an elderly fraud victim had deposited $200,000 directly into Blount's account in August 2017.

16. In March 2018, Blount returned $40,700 to a depositor. In April 2018, Blount returned $200,000 to a depositor. Deposits totaling $724,254 linked to suspect sources noted above, including the two deposits totaling $72,900 that the Dekalb County Sheriff's Office told a Blount executive originated from a fraud victim and the $131,000 deposit from a person in Beaverton, were not returned.

17. In about February 2018, Distributor 1 began to use a U.S.-based bank account under a different business name to pay Blount. Per Blount's new policy, Distributor 1 provided a letter

from the bank administering the account confirming that Distributor 1 and/or its owner were signatories on the account. Unbeknownst to Blount at that time, this bank account was funded by individuals with no logical business relationship to Distributor 1 or Blount. Between July 2020 and October 2020, Distributor 1 received $139,000 from these sources, and the money was used to pay Blount.

18. Unbeknownst to Blount at the time, in April 2017, Distributor 2 began to receive payments to its U.S.-based bank account that the FBI has linked to fraud. Distributor 2 used this bank account to pay Blount. Between April 2017 and February 2018, Distributor 2 received payments totaling $652,548.75 from several individuals with an average age of approximately 68 years old. None of the depositors had a logical business relationship to Blount or Distributor 2, and several reported being the victim of romance scams and other online fraud schemes. Blount was not made aware of the fraudulent origin of payments originating from Distributor 2 during this period.

19. In June 2018, a weekly report distributed within Blount stated that Distributor 2 was having difficulties obtaining U.S. dollars and noted media reports of a strong increase in fraudulent payments from Nigeria.

20. In February 2020, Blount received ten deposits of $19,975 each from Nigeria-based accounts that were used to pay for Distributor 2's invoices. Two of the deposits contained the memo, "for logistics and fairly used car payments."

21. In February 2020, Blount's Chief Accounting Officer (the "Chief Accounting Officer") was told of deposits to Blount from unusual sources, some of which included deposit memos for used car payments. The Chief Accounting Officer was told the deposits were from individuals, not Distributor 2, had odd payment instructions, and that this was the same pattern Blount had previously encountered with Distributor 1.

**Declaration of Damian R. Platosh**  EXHIBIT A   PAGE 5
                                      Complaint *In Rem*
                                      FOR FORFEITURE

22.     From May to June 2020, Blount received $209,000 from several sources other than Distributor 2 that were used to pay Distributor 2's invoices.  These sources included 39 money orders over two days in mostly $1,000 and $900 amounts, anonymous cash deposits, and checks from individuals with no logical business relationship to Blount or Distributor 2.  On several occasions, Distributor 2 sent an email to a Blount Credit Manager and Senior Credit Analyst with photographs of cashier's checks and confirmations to claim the payments.

23.     In January 2022, the FBI notified the Company of its investigation involving the Company, among others.  The FBI provided the Company information about its investigation including details of fraudulent deposits to Distributor 1's and Distributor 2's U.S.-based bank accounts.

24.     In November 2021, the Company terminated its relationship with Distributor 2.  In April 2022, the Company terminated its relationship with Distributor 1.  In addition, the Company has adopted and implemented a global Anti-Money Laundering policy restricting third-party payments along with required training of relevant personnel.

25.     On September 27, 2023, the Company and the U.S. Attorney's Office for Oregon entered into the Non-Prosecution Agreement included as Exhibit B.  As part of that Agreement, the Company agreed to turn over and forfeit the amount of $1,724,802.75, representing substitute assets in lieu of proceeds that are directly traceable to the violations of 18 U.S.C. § 1960 described in this declaration.

## CONCLUSION

26.     As set forth above, there is probable cause to believe, and I do believe, that the Defendant $1,724,802.75 in United States currency represents substitute assets in lieu of proceeds that are directly traceable to violations of 18 U.S.C. § 1960, and that the Defendant currency is

therefore forfeitable to the United States pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C).

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. §1746.

Executed this 26th day of October 2023.

*/s/ Damian R. Platosh*
DAMIAN R. PLATOSH
Special Agent
Federal Bureau of Investigation